# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2257

_____

| | |
|---|---|
| Johnnie D. Freeman, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota. |
| Kenneth S. Apfel, | * |
| | * |
| Defendant - Appellee. | * |

_____

Submitted:  December 15, 1999

Filed:   March 30, 2000

_____

Before McMILLIAN, JOHN R. GIBSON, and MAGILL, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Johnnie D. Freeman appeals from the summary judgment the district court[1] entered against him, affirming the decision of the Commissioner of Social Security to deny him supplemental security income benefits.  Freeman contends that the Commissioner's determination that he was not disabled during the relevant period is not supported by substantial evidence and that the ALJ hearing his case failed to develop the record by having Freeman's IQ tested.  We affirm the judgment of the district court.

_____

[1]The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

Freeman is currently receiving SSI disability benefits based on a determination of disability for low intellectual functioning, with an onset date of December 6, 1995. This appeal concerns an earlier application for SSI benefits for the period from August 16, 1993 to December 5, 1995.

Freeman was born on September 11, 1959 and began using heroin at the age of 17. He attended school through the tenth grade, but has spent his adult life in the pursuit of heroin, with periodic time-outs while in jail or rehabilitation programs. He testified that at one time he used $500 worth of heroin a day. He financed his habit by selling drugs and stealing. Freeman also used alcohol.

Freeman applied for SSI benefits on August 16, 1993, at the age of 33, claiming disability based on drug and alcohol addiction. The ALJ initially found that because Freeman was actively involved in drug dealing, he was engaged in "substantial gainful activity" and therefore was not disabled. The Commissioner denied Freeman benefits, but the district court reversed the decision because the ALJ failed to consider whether Freeman's drug dealing met the definition of "substantial gainful activity" used by the Commissioner.

By the time this case was remanded in 1997, Freeman's condition had deteriorated dramatically, and indeed he has been adjudged disabled as of December 6, 1995. The evidence at the remand hearing included medical reports written during the period at issue (August 16, 1993 through December 5, 1995) and later, during the period of conceded disability.

Also intervening between the initial hearing and the remand hearing was a significant change in the law. An amendment to the Social Security Act, passed March 29, 1996, precludes an award of SSI benefits if alcoholism or drug addiction would be a contributing factor material to the determination of disability. See Pub. L. No. 104-121, § 105(b), 110 Stat. 847, 853 (1996). The Commissioner applies the legislation by

determining whether the claimant would still be disabled if he stopped using alcohol and drugs.  See 20 C.F.R. § 416.935 (1999).

On remand, the ALJ appointed a medical advisor, Paul Reitman, Ph. D., to opine on Freeman's condition during the 1993-1995 time period, and specifically, to opine on what Freeman's condition would have been during that period if he had stopped using drugs and alcohol.  Reitman concluded that Freeman had opiate and alcohol dependence that met the Commissioner's disability listing 12.09.  See 20 C.F.R. pt. 404, subpt. P, app.1, § 12.09.  While substance addiction disorder was Reitman's principal diagnosis, he said that the record also supported a finding that Freeman suffered from depressive syndrome, with probable drug-induced psychotic symptoms. Looking at the depressive syndrome without the drug addiction, Reitman stated that Freeman would not meet the listing standard for disability.  Reitman specifically stated that the record did not contain any evidence of personality disorder during the relevant period.  He also said that there was no evidence of mental retardation, although "clearly an individual who has a major addiction is going to show intellectual deficiency."

The ALJ applied the five-step evaluation process prescribed in the regulations, see 20 C.F.R. § 416.920 (1999), taking into account medical records from examinations during the relevant time period, evaluations after that period, and the testimony of Reitman and a vocational expert at the hearing.  At the first step, the ALJ concluded that Freeman was engaged in some work during the period, but that this work was not extensive enough to amount to "substantial gainful activity."  At the second step, the ALJ determined that Freeman suffered from severe impairments, specifically depressive syndrome with probable drug-induced psychotic symptoms, low intellectual functioning, and a substance addiction disorder.  The ALJ next found that Freeman's substance addiction disorder met the requirements of 12.09, meeting the third step. Because Freeman had a substance addiction, the ALJ had to determine whether Freeman would still be disabled if he stopped using alcohol or drugs.  He determined that, absent the substance abuse, Freeman's remaining impairments would not meet the

listings for disability. See 20 C.F.R. pt. 404, subpt. P, app. 1. Therefore, the ALJ proceeded to the last two steps and found that although Freeman could not perform his past relevant work, he had the residual abilities to perform certain unskilled work, and that the kinds of jobs Freeman could do existed in the national and regional economy. Accordingly, the ALJ denied Freeman's application for benefits. The Appeals Council denied review, making the ALJ's determination the final decision of the Commissioner.

Freeman appealed to the district court, which referred the matter to a magistrate judge.[2] The magistrate judge's review was limited to ascertaining whether there was substantial evidence on the record as a whole to support the Commissioner's decision. The magistrate judge reviewed the medical records before and after the relevant period and found that Freeman had suffered a marked deterioration in mental health just after the end of the period covered by this application for benefits (August 16, 1993 through December 5, 1995). In fact, there was no evidence of mental impairments other than substance abuse until February 1996. The magistrate judge therefore recommended affirmance of the Commissioner's decision, and the district court accepted that recommendation.

On appeal, Freeman argues that there was not substantial evidence to support a finding that he was not disabled. In particular, he contends that there was no reason to believe that he would have regained the ability to function if he stopped using drugs. He also contends that the evidence established that he was mentally retarded. Finally, he contends that the ALJ failed to develop the record because he did not obtain a test of Freeman's IQ.

Judicial review of the Commissioner's decision is limited to ascertaining whether substantial evidence in the record as a whole supports the Commissioner's findings.

---

[2]The Honorable Arthur J. Boylan, United States Magistrate Judge for the District of Minnesota.

See Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). The court is required to review the administrative record as a whole, considering evidence which detracts from the Commissioner's decision, as well as that which supports it. See id. Substantial evidence is relevant evidence that a reasonable person would consider adequate to support a conclusion. See id.

## I.

Freeman contends that the ALJ's determination that he would not have been disabled if he stopped using heroin and alcohol is unsupported by the record. The Commissioner responds that there is no evidence of any impairment other than substance abuse that would have met the listings during the relevant period, and that there is evidence Freeman retained the capacity to do some work.

From 1993 to 1995, Freeman was diagnosed with opiate dependence and alcoholism. On September 28, 1993, Freeman was admitted to a drug treatment program. The admitting physician, Douglas Knight, M.D., reported that Freeman demonstrated good attention, normal behavior, and a cooperative attitude, although he had poor concentration. At that time Freeman denied ever having auditory or visual hallucinations. Knight recommended a six-week withdrawal program, but Freeman left the program after less than three weeks. A psychiatric review form completed by Dan Larson, M.D., on March 28, 1994 stated that Freeman "stole regularly to support his habit. This would have involved complex skills." Larson indicated that Freeman had a personality disorder as well as substance addiction, but he found no psychosis. He concluded that Freeman was not sufficiently impaired to meet the listings and that he had the capacity to do some kinds of work.

During 1994 and 1995, Freeman worked briefly at two jobs, including a semi-skilled job as an oil changer. This job ended when he was fired for being late to work. In 1994-1995 Freeman had a number of hospital emergency room admissions for minor

physical ailments, such as a sprained ankle. The various treating physicians make no note of psychological abnormalities (other than substance abuse), but rather describe Freeman in such terms as: "[T]hought processes are clear"; "He lifts 300 pounds on a near daily basis in bench press"; "[P]atient demonstrated good understanding of [follow-up instructions]."

On November 27, 1995, Freeman sought treatment for his heroin addiction, stating that he had "hit bottom." He reported that he had experienced various physical symptoms and visual hallucinations for as much as three days when in withdrawal. At this time Freeman reported that when he was not using heroin, he liked to socialize with his sober friends, play football, skate, swim, and work out. The examining psychologist recommended "complete abstinence from all mood altering chemicals."

Freeman's medical records show a change in 1996. On February 27, 1996, he was admitted to a hospital emergency room, complaining of hearing voices. He denied that he had ever had auditory hallucinations before. At this point, he was diagnosed with depression, as well as polysubstance abuse. In March, Ronald Kyllonen, M.D., examined Freeman and noted: "He presents as an agitated man who is hearing voices, is having anxiety symptoms, who rocks constantly, is showing a disorganized function. . . . At this point he is not at all interviewable and has difficulty concentrating and following through." At this time, Kyllonen thought Freeman might have an underlying psychotic process, a panic disorder, or depression. Still, in April 1996, Kyllonen wrote: "The [primary] issue is the C/D [chemical dependency] (not a Psychiatric problem.) Learning not to need to use is what needs to happen. Despair & depression seem to be [secondary]."

Not until May 1996, when consulting psychologist Robert Lopno examined Freeman, does the record show a provisional diagnosis of paranoid type schizophrenia and opiod-induced psychotic disorder with delusions. The notes from that examination show a radically different patient than the one reflected in notes from the 1993-1995

time period.  Whereas in 1993 his behavior was within normal limits and he was well-groomed, in the interview with Lopno, he was "not oriented to person, place, time or reason," wore a funny hat and a several-day old beard, couldn't walk without assistance, and cried during the examination.

Freeman relies on the observations and diagnoses of Kyllonen and Lopno, which he contends show that abstinence from drug use would not have improved his condition.  The examination reports of Kyllonen and Lopno do indeed show a terribly debilitated patient with psychological impairments either in addition to drug addiction or at least inseparable from it.  There is no suggestion by Kyllonen or Lopno that Freeman would ever improve.  However, these examinations are not from the relevant time period; they differ vitally from reports about Freeman during the relevant time, and they date from a period during which he was undisputedly disabled.  In contrast, during the relevant period, there was no diagnosis of psychosis, and there were indications that Freeman could socialize, engage in sports, work, and take care of himself when he was not abusing drugs.  Even though Kyllonen was a treating physician, because his evidence did not pertain to Freeman's condition during the relevant period and was inconsistent with other substantial evidence that did pertain to the relevant period, the ALJ was under no obligation to give Kyllonen's opinion controlling weight.  Cf. Prosch v. Apfel, 201 F.3d 1010 (8th Cir. 2000) (applying 20 C.F.R. § 404.1527(d)(2)).  There is substantial evidence on the record as a whole to sustain the Commissioner's finding as to the 1993-1995 time period.

## II.

Freeman argues that the ALJ failed to develop the record by failing to have Freeman's IQ tested, and that the record showed Freeman met the listings for mental retardation.

The ALJ has the duty to develop the record fully and fairly, even where, as here, the claimant is represented by counsel. See Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985). "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Id. (quoting Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984)). However, in this case, by the time of the hearing Freeman was in such a state that his IQ could not be tested, as Freeman concedes in his brief. There was discussion of this issue on the record at the hearing, when Dr. Reitman asked why there was no IQ test in the record. Freeman's attorney replied, "The doctor [Lopno] was going to give him a [WAIS IQ test], but . . . [i]t seems like it was . . . very difficult. . . ." Given the extreme debilitation Freeman showed in 1996, we cannot fault the ALJ for failing to order an IQ test that would have been an exercise in futility.

Moreover, the results of a test at the time of the hearing in 1997 would have been of limited relevance to the inquiry of whether Freeman was mentally retarded during 1993-1995. Listing 12.05 states: "Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. The only contemporaneous evidence in the record pertaining to Freeman's intellectual functioning during the period covered by this application for benefits refutes the idea that he had abnormally low intelligence before the age of 22. Freeman finished the tenth grade, participated in GED classes, and held a semi-skilled job as an oil changer. Examinations of Freeman during the period covered by this application for benefits contain no hint that Freeman was retarded. In September 1993, Knight characterized his intelligence as "[s]omewhat less than average." The psychiatric review form filled out by Larson in 1993 stated that there was no evidence of mental retardation. Reitman testified: "[C]learly an individual who has a major addiction is going to show intellectual deficiency. But there is nothing in the record . . . that would document or substantiate retardation." Again, reports of examinations after the relevant period, when Freeman had clearly deteriorated, do not necessarily

prove what his condition was during the 1993-1995 time frame, see Box v. Shalala, 52 F.3d 168, 172 (8th Cir. 1995) (evidence of IQ test showing deterioration after period in issue not relevant), and they certainly do not establish that his low intellectual functioning began before the age of 22. Cf. Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998) (Commissioner's finding that claimant did not meet listings for mental retardation supported by substantial evidence where first suggestion in medical records of intellectual shortcomings came at age 29); Williams v. Sullivan, 970 F.2d 1178, 1184-86 (3d Cir. 1992) (even where record contained IQ test result of 66, claimant's work history refuted assertion that he had abnormally low intelligence before age 22). There is substantial evidence on the record as a whole to support the Commissioner's conclusion that Freeman did not meet the listing for mental retardation.

We affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.