136 F.Supp.2d 971 (2001)
Ingrid I. HIGGINS, Plaintiff,
v.
Kenneth S. APFEL, Commissioner of Social Security, Defendant.
No. 4:99CV1438 CDP.
United States District Court, E.D. Missouri, Eastern Division.
March 30, 2001.
*972 Philip A. Senturia, Gateway Legal Services, Inc., St. Louis, MO, for Ingrid Higgins, plaintiffs.
Henry J. Fredericks, Asst. U.S. Attorney, Michael W. Reap, Office of U.S. Attorney, St. Louis, MO, for Social Security Administration, Kenneth S. Apfel, defendants.

MEMORANDUM AND ORDER
PERRY, District Judge.
This is an action under 42 U.S.C. §§ 405(g) and 1381 for judicial review of the Commissioner's final decision denying Higgins's application for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. Higgins claims she is disabled because of sickle cell disease and proliferative sickle cell retinopathy. Because I find that the decision denying benefits was not supported by substantial evidence, I will reverse the decision.

Procedural History
Higgins initially filed applications under Titles II and XVI on February 24, 1993 and January 22, 1993, alleging that she became unable to work in 1992. The Commissioner denied these applications at the initial stage on April 1, 1993, and Higgins did not pursue them. She filed the current applications on February 14, 1997, alleging the same onset date as in her previous applications. The new applications were denied initially and on reconsideration. Higgins requested a hearing which was held on December 18, 1998. The ALJ denied Higgins's applications on March 27, 1998, concluding that Higgins's claims were res judicata as to the period before April 1, 1993, and that Higgins was not under a disability between April 1, 1993, and December 31, 1996, the date Higgins's insured status expired. The Appeals Council denied review of the ALJ's determinations. Thus, the decision of the ALJ stands as the final determination of the Commissioner.

*973 Testimony Before the Administrative Law Judge

At the time of the ALJ's decision, Higgins was 31 years old. She has a high school education and worked part time as a cashier and/or clerk until September of 1991. Higgins testified that she stopped working because her employer fired her for having missed a week of work. She claimed that her week-long absence was due to a painful "crisis" caused by her sickle cell anemia. Higgins described a crisis as "pain in either ... your legs, arm or your back and swelling." She testified that, although she had had sickle cell disease and crises before 1991, her crises last longer now. Higgins attributed the longer duration of the crises to the birth of her child in 1992. She testified that her crises occur once or twice per month around the time of her menstrual cycle, and that she estimates that she would lose one or two weeks of work per month due to her crises if she were employed. Higgins also testified that she always suffered from insomnia whether or not she was experiencing a crises.
Higgins testified that she did not usually go to the hospital when she experienced crises because hospital staff "don't take the illness seriously and you can sit there for hours before somebody will come in and see you." To treat her crises, Higgins soaks in a hot bath every fifteen minutes, increases her fluids, takes Demerol for pain, and stays off her feet. She testified that she is not able to leave her house or engage in her ordinary household activities during her crises. She testified that, although she cared for her five year old son, he heated dinners for himself and made his own bed during her crises.
Higgins also testified that her sight is poor and that blood sometimes accumulates in her eye due to retinal hemorrhages caused by proliferative sickle cell retinopathy. She testified that, when she gets blood in her eye, she loses vision in that eye for about three weeks until the blood drains out. She testified that this loss of sight had occurred twice in the past year. She also testified that she experiences headaches and eye strain as a result of her sickle cell retinopathy, and that the medication she takes for these symptoms makes her drowsy.

Medical Records

A. Dr. Busiek

Dr. Donald Busiek, M.D., of St. Louis Regional Medical Center's sickle cell anemia clinic, has treated Higgins for sickle cell disease since at least April 11, 1995. Dr. Busiek's notes from that date indicate that Higgins voiced no complaints of discomfort. He noted that she underwent laser eye surgery on March 23, 1995, and indicated that she had experienced no eye-related symptoms since the surgery. Dr. Busiek also reported that she had experienced two sickle cell crises in the last month, but reported that she had no current problems. He refilled Higgins's prescriptions for folic acid and Demerol.
Higgins saw Dr. Busiek for a follow-up visit on July 11. Dr. Busiek's notes indicate that Higgins had no current complaints, but had gone to the emergency room at St. Louis Regional Medical Center on July 2 because of a painful crisis. After waiting three hours and receiving no treatment, Higgins went home and treated her crisis by resting, forcing fluids, and taking Motrin. Dr. Busiek's notes suggest that Higgins went to the emergency room during the crisis because she had run out of Demerol. He also reported that Higgins's pain crises usually occur during her menstrual cycles. In addition to refilling Higgins's prescriptions for folic acid and Demerol, Dr. Busiek prescribed hydroxyurea. Dr. Busiek's notes from August 8, 1995, however, indicate that Higgins stopped *974 taking hydroxyurea because it seemed to cause itchy rashes.
In a follow-up appointment on September 5, 1995, Higgins reported that she had experienced another crisis during a menstrual cycle, which she treated with Demerol, fluids, and bed rest. Dr. Busiek's notes also indicate that Higgins had undergone another laser eye surgery due to a retinal hemorrhage on August 26, 1995. Dr. Busiek again prescribed hydroxyurea, and instructed Higgins to return to the clinic if she experienced more rashes.
On October 3, Higgins presented to Dr. Busiek for a follow-up visit and to receive medication refills. She again noted her painful crises but had no current complaints. Dr. Busiek increased the dosage of hydroxyurea.
In a follow-up appointment on October 24, Higgins complained excessive bleeding during her menstrual cycles, nosebleeds, and bright red blood in her stools. She reported taking about twelve aspirin per day for the past month. Dr. Busiek instructed Higgins to stop taking aspirin, and prescribed Ultram for Higgins's episodes of moderate pain. He also prescribed a new medication for arthritis pain.
Dr. Busiek's notes from Higgins's appointment on May 7, 1996 indicate that Higgins had experienced four retinal hemorrhages in her left eye, two retinal hemorrhages in her right eye, and five laser eye surgeries. He also noted that she had been referred for a sixth eye surgery and that she had stopped taking hydroxyurea because she believed it increased her retinal hemorrhages. Additionally, Higgins reported having experienced six crises since January of 1996. Dr. Busiek noted that the crises were "fairly active ... but mild, and controlled at home." He suggested an opthalmologist follow up due to the retinal proliferation.
On June 11, Higgins visited Dr. Busiek complaining of frequent headaches. She also reported having experienced three painful crises since her last appointment, and expressed concern that her crises were becoming more frequent. Dr. Busiek's notes suggest that Higgins's headaches may have been related to her pain crises or to her eye problems. On June 25, Higgins again visited Dr. Busiek complaining of headaches. She reported that her medication did help somewhat. Dr. Busiek's notes indicate that Higgins had some eye symptoms due to her hemorrhages and surgeries, and that she had experienced several crises since her last visit.
In a follow-up visit on July 9, Higgins complained of headaches and neck pain, and stated that her most recent headache had kept her up all night. She also complained of swelling in both feet. Dr. Busiek's records indicate that Higgins went to see an opthalmologist and that the opthalmologist prescribed glasses. On August 14, Higgins visited Dr. Busiek complaining, again, of headaches and neck pain. She also complained of nausea and loss of appetite, and noted that her vision was worsening.
On October 15, Higgins again presented to Dr. Busiek. She complained of bilateral hand pain and headaches, and said that her eyes "were still bothering her." Higgins reported that reading glasses helped somewhat. She also reported experiencing swelling in her hands, knees, and jaws. Dr. Busiek characterized the course of Higgins's disease as "stable." In her December 10 follow up visit, Higgins complained of tiredness, continued headaches, and insomnia. She also reported minor crises, none of which required hospitalization or an emergency room visit.
On March 18, 1997, Higgins presented to Dr. Busiek complaining of a chest cold, non-productive coughing, chills, hoarseness, and back pain. She also claimed that *975 it hurt when she took a deep breath. Dr. Busiek admitted Higgins to St. Louis Regional Medical Center, apparently either attributing her symptoms to a sickle cell crisis or fearing that her symptoms could trigger a crisis. Against medical advice, Higgins left the hospital two hours after admission.
On April 8, Higgins presented to Dr. Busiek complaining of a retinal hemorrhage. She reported seeing floating blood in her eyes. Dr. Busiek's notes indicate that Higgins had made an appointment with an opthalmologist.
On May 13, Higgins presented to Dr. Higgins for a follow up visit. She complained of recurrent leg and back pain for the past two months. She also stated that she had experienced another "bleed" in her right eye and that she had felt very bad since her bleed in April. Furthermore, Higgins complained of emesis, constipation, worsening headaches, abdominal pain, and a non-productive cough. Busiek's notes characterized the course of Higgins's disease as stable and noted that she continued to have minor crises.
Higgins saw Dr. Busiek for a follow-up visit on July 8. She complained of headaches, abdominal pain, and sinus drainage. Dr. Busiek's notes indicate that Higgins went to the emergency room in June for a crisis. Higgins reported that she had an additional crisis two weeks ago, and that the crisis kept her in bed for a week. She also complained of all-over joint pain and back pain due to a recent car accident. Dr. Busiek characterized the course of Higgins's disease as "unstable."

B. Dr. Blinder

Higgins was treated by Morey A. Blinder, M.D., from February 9, 1998, until at least June 19, 1998. On her first visit, Dr. Blinder noted that Higgins "is known to have Hgb SC disease that has been complicated by pain episodes approximately every month," and that Higgins's "pain rarely requires an emergency room visit." He characterized Higgins's disease as being on "a relatively indolent course consistent with SC disease."
Higgins saw Dr. Blinder for a follow-up visit on March 9, 1998. She reported two week-long episodes of leg pain and swelling since her last visit. Dr. Blinder's notes describe Higgins's disease as "SC disease with recent crises that is partially relieved with oral Demerol." He noted that he suggested that she try another medication "to improve the quality of her pain control."
Higgins again presented to Dr. Blinder on June 5. She reported that she had been controlling her pain well with her new medication, but again complained of abdominal pain and headaches. Dr. Blinder noted that Higgins's "sickle cell pain is controlled on Dilaudid." On June 19, however, Higgins visited Dr. Blinder complaining of pain in her left hip, leg and back typical of her sickle cell pain. Dr. Blinder noted that Higgins was "getting some relief from her P.O. Dilaudid but she is requiring 2-3 tablets every 4 hours," and that "the patient has inadequate pain control on her oral Dilaudid." He characterized her disease as "SC disease with multiple crises triggered by irregular menstrual cycles," and elected to send Higgins "to the treatment room to receive IV fluids and IV pain medications to try to bring her pain under control." Dr. Blinder also noted that Higgins's menstrual irregularity could be due to polycystic ovary disease or to hypothyroidism. He indicated that Higgins had a history of thyroid problems.

C. Medical Opinion Evidence

On March 27, 1997, Dr. James E. Greenwald, M.D., conducted a disability evaluation of Higgins. Higgins reported that her crises usually occur once a month and that *976 they usually involve pain in the joints of her left leg. Dr. Greenwald noted that Higgins's crises can be caused by upper respiratory infections and tend to cycle with her menstrual periods. Dr. Greenwald stated that Higgins had no functional limitations, but noted that if Higgins had crises once a month she might have difficulty with absenteeism in a work environment.
On April 24, 1997, Higgins saw Dr. Nicholas Colosi, M.D., for a visual disability evaluation. Dr. Colosi noted heavy scarring from laser therapy throughout the periphery of both of Higgins's eyes. He diagnosed advanced sickle cell retinopathy, constricted visual fields due to laser therapy, and decreased visual acuity due to sickle cell retinopathy. Dr. Colosi opined that Higgins could not obtain a driver's license or perform jobs with moving equipment, that she could use public transportation and care for herself in a familiar environment, and that she required frequent examination by a retinal surgeon.
In a letter to Higgins's attorney faxed on February 11, 1998, Dr. Busiek stated that Higgins suffers from the "SC" form of sickle cell disease, "which is characterized by frequent painful blood vessel occlusive events and severe visual problems." He further noted that "the events are extremely painful, requiring aggressive hydration and potent narcotic analgesics," and that the events "can last from several hours to several weeks." Additionally, Dr. Busiek stated that Higgins "has had several painful hemorrhages into the eye and has had significant visual loss in both eyes." He opined that "the eye problem also contributes to chronic headaches," and concluded by stating that, in his opinion, "Ms. Higgins should be considered totally disabled."

Legal Standards
A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Clark v. Apfel, 141 F.3d 1253, 1254 (8th Cir.1998); 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find the evidence adequate to support the ALJ's conclusion. Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir.1997). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000)(quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir.1999)). A court may not reverse the Commissioner merely because substantial evidence exists supporting a different outcome. Black v. Apfel, 143 F.3d 383, 385 (8th Cir.1998).
To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:
(1) the credibility findings made by the Administrative Law Judge;
(2) the education, background, work history, and age of the claimant;
(3) the medical evidence from treating and consulting physicians;
(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;
(5) any corroboration by third parties of the plaintiff's impairments; and
(6) the testimony of vocational experts when required which is based upon a proper hypothetical question.
Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523 (8th Cir. 1980); Stewart v. Secretary of Health and *977 Human Services, 957 F.2d 581 (8th Cir. 1992).
Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.
First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, she is not disabled.
Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled.
If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.
If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform her past relevant work. If the claimant can perform her past relevant work, she is not disabled.
If the claimant cannot perform her past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.
When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir.1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir.1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984), which include:
claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.
A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. Singh, 222 F.3d at 451. A treating physician's opinion concerning a claimant's impairment will be granted controlling weight, if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. Id. While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that an opinion "do[es] not automatically control, since the record must be evaluated as a whole." *978 Prosch v.. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000).
The Eighth Circuit has upheld an ALJ's decision to discount or disregard the opinion of a treating physician in situations in which other medical assessments "`are supported by better or more thorough medical evidence'" or in which a treating physician gives inconsistent opinions that undermine the credibility of the opinions. Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir.1997)). In any event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion. Singh, 222 F.3d at 452; Prosch, 201 F.3d at 1013; 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2).
The Eighth Circuit has consistently held that the ALJ has the "duty to develop the record fully and fairly," even where the claimant is represented by counsel. Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir.2000); Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir.1985); Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir.1984). This includes the duty to develop the record as to the medical opinion of the claimant's treating physician. See, e.g., Brown v. Bowen, 827 F.2d 311, 312 (8th Cir.1987); Brissette v. Heckler, 730 F.2d 548, 549-50 (8th Cir. 1984); Thorne v. Califano, 607 F.2d 218, 219-20 (8th Cir.1979). If the treating physician "has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated ... to address a precise inquiry to the physician so as to clarify the record." Lewis v. Schweiker, 720 F.2d 487, 489 (8th Cir.1983). If the physician's reports of the claimant's limitations are stated only generally, the ALJ should ask the physician to clarify and explain. See Vaughn, 741 F.2d 177, 179 (8th Cir.1984).

The ALJ's Findings
In this case, the ALJ found that Higgins had the severe impairments of SC type sickle cell anemia and sickle cell retinopathy controlled with laser therapy. He found, however, that she did not have an impairment of combination of impairments which met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. In particular, he found that Higgins's impairments did not meet or equal the criteria of paragraphs "A" or "B" of listing 7.05, the listing for sickle cell disease, and that her eye impairment did not meet or equal the criteria of listing 2.00. The ALJ further found that the evidence did not establish that Higgins's symptoms rendered her unable to perform any type of competitive work. Specifically, he found that Higgins retained the residual functional capacity to lift a maximum of 20 pounds and frequently lift or carry 10 pounds, to stand, walk, or sit throughout most of the work day, and to occasionally push, pull, and stoop. He also found that Higgins's vision impairments did not prevent her from performing the exertional or non-exertional requirements of work except that she was restricted from working around fast-moving machinery. He therefore found that Higgins could return to her past relevant work as a crew member at a fast food restaurant.
In making his findings, the ALJ discounted Dr. Busiek's letter opining that Higgins "should be considered totally disabled" because he regarded the letter as inconsistent with the evidence in the record as a whole. He found that Dr. Busiek's statement that sickle cell disease "is characterized by frequent painful blood vessel occlusive events" was not consistent with the medical evidence because Higgins's physicians' notes repeatedly indicated that Higgins was "not in any acute distress" at the time of her visits, because *979 her physical examinations were "generally unremarkable" with the exception of her eye problems, and because Higgins had not reported "a level of pain severity" to Dr. Busiek that would support his opinion. He also found that Busiek's general statement that "many [crisis] events require hospitalization" was not supported by the evidence in the record.
The ALJ also rejected Higgins's testimony that she was house-bound one or two weeks every month as a result of her disease. He found Higgins's sickle cell disease and sickle cell retinopathy could reasonably be expected to produce pain. He found, however, that the alleged severity of the symptoms was not supported by objective medical evidence. He went on to identify several factors that he believed undermined the credibility of Higgins's testimony that her pain was debilitating. First, he stated that Higgins went to the hospital or the emergency room on only two occasions. He noted that, on one occasion, she left the emergency room after three hours without receiving treatment, and that, on the second occasion, she left the hospital after two hours against medical advice. Additionally, the ALJ discredited Higgins's asserted reasons for not seeking emergency room treatment, stating that "the claimant's criticism of the emergency room staff is not persuasive." The ALJ believed, moreover, that Higgins's methods of controlling her pain  soaking in a hot tub and taking fluids and pain medications  were not indicative of debilitating pain. Finally, the ALJ believed that Higgins's work history, which consisted primarily of part-time work, suggested that Higgins had a less than strong motivation for full time employment.

Discussion
The ALJ correctly determined that Higgins's claim is barred by res judicata as to the period before April 1, 1993, the date of the Commissioner's final order denying Higgins's applications filed on January 22 and February 24, 1993. I find, however, that the ALJ's decision that Higgins was not disabled is not supported by substantial evidence. I note that the ALJ correctly identified that the issue presented by this case is whether Higgins's pain crises are sufficiently frequent and severe as to prevent her from engaging in gainful activity. The ALJ thoroughly analyzed this issue, making detailed credibility findings. I nevertheless conclude that the evidence in this case compels a finding that Higgins is disabled.
The ALJ apparently credited Higgins's testimony as to the frequency of her crises. He noted that Higgins "testified that her crises occur predominantly with her menstrual cycle, and this is supported in her treatment notes." However, the ALJ discredited Higgins's testimony to the extent that she alleged her pain was sufficiently severe and protracted to render her disabled. Although I recognize that the ALJ's credibility findings are entitled to considerable deference, substantial evidence did not support this finding.
Most of the reasons that the ALJ cited in discrediting Higgins's allegations of severe pain relate to her failure to seek emergency room treatment or hospitalization during her crises. Initially, I note that Higgins's failure to seek hospitalization would not alone constitute a sufficient basis for rejecting her allegations of debilitating pain. Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir.1984). Moreover, while a claimant's failure to seek hospitalization is certainly one factor that an ALJ may consider in assessing the credibility of her allegations of pain, I believe that, on this record, this factor was not entitled to significant weight. Higgins testified that she presented to the emergency room during a crisis on July 2, 1995 and received no attention in the course of three hours. *980 The record amply documents this incident. The evidence also reveals that the remedies Higgins pursued at home  forcing fluids, soaking in a hot bath, and taking potent narcotic pain medications such as Demerol  were somewhat effective in controlling her pain. It may be, as the ALJ found, that Higgins criticisms of emergency room staff are not fully persuasive. Nevertheless, in light of Higgins's experiences, her decision to attempt to control her crises at home in lieu of seeking emergency room treatment was rational and not inconsistent with her allegations of debilitating pain. Furthermore, the record contains little or no support for the ALJ's apparent assumption that more effective treatment options would have been available to Higgins in a hospital environment.
Similarly, the ALJ erred in finding Higgins's chosen methods of treatment inconsistent with her allegations of severe pain, because there is no evidence that more drastic methods exist for treating sickle cell pain, nor is there evidence that any such methods would have provided Higgins with more effective relief. Moreover, the treatment methods pursued by Higgins  particularly her use of Demerol to control her crisis pain  were drastic enough in themselves and are entirely consistent with allegations of severe pain. As Dr. Busiek's letter emphasized, Demerol is a potent narcotic analgesic dispensed for severe pain. The record reveals that Higgins used other, less potent analgesics, such as Aspirin and Tylenol, for non-crisis pain, but also regularly sought refills of her Demerol prescription.
I also note that the medical records reveal that Higgins consistently complained of pain to Dr. Busiek and Dr. Blinder. The treating physicians' notes, and Dr. Busiek's letter, indicate that Higgins's physicians credited these complaints and responded to them. Moreover, contrary to the ALJ's findings, the evidence reveals that Demerol did not fully relieve Higgins's pain. Higgins continued to complain of pain to Dr. Busiek despite her regular use of Demerol. Dr. Blinder's notes state that Higgins's disease was "partially relieved with oral Demerol," and suggested that she try another medication "to improve the quality of her pain control." In a later visit, Dr. Blinder noted that the new medication inadequately controlled Higgins's pain, and prescribed intravenous hydration and pain medication. The record, in short, provides ample documentation of Higgins's testimony of frequent, severe crisis pain. Layton v. Heckler, 726 F.2d 440, 442 (8th Cir.1984) (evidence that claimant takes high does of pain medications and has consistently complained of pain undermines ALJ's determination that claimant's allegations of pain are not credible).
There was no evidence inconsistent with Higgins's allegations. The Social Security Administration's examining physician stated that Higgins's crises could result in excessive absenteeism if their frequency was documented, indicating that he did not question that the crises could be of sufficient severity to render Higgins disabled. The ALJ found that Higgins's history of part-time employment suggested a lack of motivation for full-time employment. However, in light of the overwhelming evidence that Higgins suffered disabling crises, and in light of the fact that Higgins's earnings history shows regular employment which abruptly ceased, her employment history does not constitute substantial evidence that she was not disabled. Higgins's allegations of disabling pain were not inconsistent with the record as a whole and the ALJ should have credited them. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir.1994) (ALJ may discredit subjective complaints of pain only if they are inconsistent with the record as a whole).
*981 I may award retroactive benefits only for the twelve months prior to the date of Higgins's applications, February 14, 1996. 42 U.S.C. § 423(b); Van Horn v. Heckler, 717 F.2d 1196, 1200 (8th Cir.1983). I find that the record in this case compels a finding that Higgins is disabled and has been disabled since at least February 14, 1996, twelve months before the date Higgins filed the applications under consideration here. I will remand to the Commissioner for calculation and award of benefits in accordance with this opinion. I note that the ALJ found that Higgins's insured status expired on December 31, 1996. I do not disturb that finding here.
Accordingly,
IT IS HEREBY ORDERED that the decision of the Commissioner denying Ingrid I. Higgins's applications for benefits is reversed.
IT IS FURTHER ORDERED that this case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits in accordance with this opinion.
A separate judgment in accord with this order is entered this date.

JUDGMENT
In accordance with the Memorandum and Order entered this same date,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that that the decision of the Commissioner denying Ingrid I. Higgins's applications for benefits is reversed and this case remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits.