# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1371

_____

| | | |
|---|---|---|
| Sandra L. Charles, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Jo Anne B. Barnhart, Commissioner | * | |
| of Social Security, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 13, 2004
Filed: July 26, 2004

_____

Before BYE, HEANEY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Sandra L. Charles appeals the district court's[1] decision affirming the Social Security Administration's denial of her claim for Social Security disability benefits. In denying benefits, the administrative law judge (ALJ) determined that although Charles could not return to her past work, she could perform a significant number of jobs in the regional and national economy and, thus, she was not disabled. Because the decision is supported by substantial evidence, we affirm.

_____

[1] The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

## I. *Background*

Charles worked as an assembler until 1995 when her employer eliminated her job due to restructuring. Charles worked at another assembly job for approximately six months before quitting. She claimed that she quit this job because she was experiencing shoulder pain, but she previously reported that she stopped working because her employer would not fill out an injury report. Charles also worked briefly at a seafood shop, a job that required constant bending. Charles said she left this job because it was too strenuous. Charles, who earned a General Equivalency Diploma (GED) in 1991, was fifty-two years old when the ALJ denied her application for benefits.[2]

Charles's claim alleged she had been disabled since April 15, 1998, due to back and neck injuries, arthritis, and a leg fracture. She said she could not work because she could not lift more than nineteen pounds and could not sit or stand much. Charles reported that her activities included light cooking, washing dishes, making beds, and vacuuming. She also said she walked, shopped at flea markets for recreation, visited family members, and drove to appointments and to the grocery store.

At the administrative hearing on April 27, 1999, Charles testified that she lived in a two-story home, drove herself to the hearing, and was able to care for her personal hygiene, dressing, and bathing. Charles said she did little cooking, but was able to wash dishes, do laundry (with help carrying), and shop for groceries. She said vacuuming and mopping, which required bending, were difficult. Charles testified that she liked to read and work outside in her flower garden. Charles testified that her physician told her not to lift over twenty pounds or bend repetitively. She stated she could sit for about fifteen to twenty minutes, stand about ten to fifteen minutes, and had no problem walking. She said she moved frequently in order to alleviate back

---

[2] This case involves Charles's second application for disability benefits. An ALJ denied her first application for benefits on April 14, 1998.

pain and used an anti-inflammatory medication once a day. Charles reported that a workers' compensation claim related to her injuries was still pending.

Charles injured her lower back and ultimately underwent disc surgery in 1992. In 1993, a functional capacity evaluation showed that Charles could perform light work but should avoid prolonged or repetitive neck flexion and should change positions every thirty minutes. Charles returned to light work following the surgery, and she continued to work until she was laid off in 1995.

Charles visited her family physician, Lee Rock, M.D., for periodic check-ups, and she occasionally had other medical complaints. Charles received monthly injections of vitamin B12 beginning in 1996. In April 1996, Charles reported shoulder "discomfort" related to a workers' compensation injury, which Dr. Rock attributed to overuse bursitis. In August 1996, Charles complained of fatigue, and Dr. Rock prescribed Synthroid (a thyroid hormone replacement) to treat Charles's underactive thyroid.

In October 1996, Charles saw a rheumatologist, Edward Ford, M.D., complaining of joint pain in her feet, hands, shoulder, and thigh. Dr. Ford's examination revealed no joint inflammation or abnormalities other than osteoarthritis. He attributed Charles's joint pain to osteoarthritis, degenerative joint disease, and deconditioning, and he recommended a rehabilitation program. Noting the recent diagnosis of hypothyroidism, Dr. Ford commented that thyroid disease "can have musculoskeletal ramifications," and he predicted that Charles would regain strength and stamina as her thyroid status normalized.

In January 1997, Charles told Dr. Rock that she experienced left shoulder pain after starting a swimming program. Dr. Rock noted that to the extent Charles's exercise instructor was concerned about functional restrictions, the instructor should review the functional capacity evaluation and "start with those limitations." In August

1997, Charles reported less arthritis-like pain, and in September 1997, she said she felt somewhat fatigued at times. In October 1997, Charles complained of ringing in her ears. Audiologist M. Cheple noted some unusual hearing test results and indicated Charles could discuss with Dr. Rock the possibility of additional testing.

At the request of the state disability evaluation agency, Lawrence Jedlicka, M.D., examined Charles in July 1998. Charles reported that she fractured her left leg in 1990, but said it no longer bothered her. She also reported intermittent low back pain and neck pain. Cervical spine x-rays revealed mild arthritis at C4-5 and "likely" degenerative disc disease at multiple levels without any loss of disc height. Lumbar spine x-rays showed normal alignment with spondylosis and degenerative disc disease at multiple levels. Dr. Jedlicka's examination revealed mildly limited neck range of motion and mild neck tenderness and muscle spasm, along with limited lumbar motion and muscle spasm. Dr. Jedlicka noted normal muscle strength, tone, and mass; present and symmetric reflexes; and no sensory deficit. Dr. Jedlicka observed that Charles could stand, walk, stand on one foot, walk on her heels and toes, get on and off the examination table, reach overhead, and undress without difficulty. Dr. Jedlicka's impression was cervical and lumbar strain.

Charles returned to Dr. Rock in August 1998 complaining of a recurrence of low back pain with no identifiable cause. Dr. Rock's examination of Charles revealed adequate range of motion, good strength, normal reflexes (other than an absent ankle reflex, which was normal for Charles) and normal sensation. Dr. Rock recommended the "judicious" use of Darvocet,[3] and instructed Charles to return if she had additional problems.

---

[3] Darvocet is an opioid analgesic used to treat mild to moderate pain.

The record included several opinions about Charles's ability to perform work-related activities. Following his July 1998 examination, Dr. Jedlicka concluded Charles could lift ten pounds intermittently and could stand/walk or sit for ten minutes at a time before changing positions, but should avoid strenuous or frequent bending, pushing, and pulling. Frances Peccoraro, M.D., reviewed the record evidence (including Dr. Jedlicka's examination report) in July 1998. Dr. Peccoraro indicated Charles could lift twenty pounds occasionally and ten pounds frequently, and could both stand/walk and sit for about six hours in an eight-hour work day. Thomas Chisholm, M.D., reviewed the evidence (including Dr. Rock's August 1998 office note) in October 1998. He agreed with Dr. Peccoraro's assessment that Charles could perform light work.

Physical medicine and rehabilitation specialist Andrew Steiner, M.D., appeared at the administrative hearing and testified as a medical expert. Dr. Steiner testified that the record established treatment for low back pain (related to a strain, degenerative disc disease, and a past surgical procedure), neck pain (probably related to degenerative disc disease), tinnitis and slight hearing loss, and anemia. Dr. Steiner commented that the record did not document neurological loss related to Charles's degenerative disc disease. He indicated that Charles could lift ten pounds and could spend an unlimited amount of time on her feet if she were given the opportunity to move around. Dr. Steiner recommended against repetitive neck motion as well as repetitive bending, twisting, stooping, kneeling, and crawling.

Vocational expert Juletta Harren testified at the administrative hearing. The ALJ asked Harren to assume a hypothetical individual with low back pain related to degenerative joint disease and a prior surgical laminectomy, as well as neck pain and anemia. The hypothetical individual could lift ten pounds occasionally and could sit or stand in one place for only ten to fifteen minutes at a time, but could otherwise be on her feet for an unlimited period of time as long as she had the opportunity to move around. The hypothetical individual was further limited to work that did not involve

repetitive neck motion, repetitive bending, twisting or kneeling, or crouching, or crawling. Harren testified that an individual of Charles's age, education, and work history with the given limitations could make a successful vocational adjustment to a variety of jobs, including a security guard, stock checker, machine tender, and office clerk. Harren further testified that in Minnesota about 12,500 such jobs existed that would accommodate the limitations set forth in the hypothetical.

Following the hearing, Charles submitted a letter from Dr. Rock dated April 30, 1999. Dr. Rock indicated that he had reviewed Dr. Jedlicka's examination and "would not disagree with his conclusions or modify the restrictions." Dr. Rock added that, at Charles's last evaluation, he advised her not to stand for more than four hours per work day. He also stated that, "[i]nitially, when she returned to work, she should limit it to a 4-hour workday until such time that she has had to acclimate."

The ALJ concluded, under step four of the five-step sequential evaluation, that Charles could not return to her past work as an assembler. However, the ALJ determined that Charles retained the residual functional capacity ("RFC") to lift ten pounds occasionally; she could spend an unlimited amount of time on her feet, provided she could move around and did not have to sit or stand in one place for more than ten to fifteen minutes; and she could not perform repetitive neck motion or repetitive bending, twisting, kneeling, crouching, or crawling. As such, at step five of the sequential evaluation, the ALJ–relying on the vocational expert's testimony–concluded that Charles was not disabled because she could perform a significant number of other jobs in the regional and national economy.

II. *Analysis*

A. *Jurisdiction*

As a preliminary matter, the Commissioner asserts that we lack jurisdiction to consider Charles's appeal because she failed to timely appeal from the final order in this case. Specifically, the Commissioner argues that Charles's attempt to file a Rule

59(e) motion to alter or amend the judgment did not toll the time to file an appeal because the motion itself was not timely filed. The Commissioner argues that Charles's attempt to secure an extension of time to file a supplement to the Rule 59(e) motion was invalid, and that the district court's order striking Charles's Rule 59(e) motion nullified any extension of time to file an appeal. Charles responds that the district court initially granted an extension to file the supporting arguments to her Rule 59(e) motion, and that despite the court's later order, this properly tolled her appeal time.

We are required to ascertain the existence of jurisdiction, whether subject-matter or appellate, at the outset of an appeal. *Arnold v. Wood*, 238 F.3d 992, 994 (8th Cir. 2001). In most cases, an appellant must file a notice of appeal within thirty days of the district court's final judgment. Fed. R. App. P. 4(a)(1)(A). This requirement is jurisdictional in character–if it is not satisfied, we may not reach the merits of the case. *Arnold*, 238 F.3d at 994–95 (citing *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 203 (1988)). However, we may toll the notice of appeal period if the district court erroneously believed that a litigant's Rule 59(e) motion was timely filed, and the litigant relied upon the court's express representation that the motion was timely filed. *Thompson v. INS*, 375 U.S. 384, 386–87 (1964) (per curiam). The Supreme Court later explained that, "[b]y its terms, *Thompson* applies only where a party has performed an act which, if properly done, would postpone the deadline for filing his appeal and has received specific assurance by a judicial officer that this act has been properly done." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 179 (1989). This equitable exception has come to be known as the "unique circumstances" doctrine. *See, e.g., Schwartz v. Pridy*, 94 F.3d 453, 456 (8th Cir. 1996).

Because the doctrine is equitable, we must interpret it narrowly and apply it sparingly so that it does not defeat the statutory scheme of appellate jurisdiction crafted by Congress. The doctrine permits an appeal from an untimely Rule 59(e) motion, when the district court "specifically assures" a party that its motion is timely,

and the party relies upon that assurance in failing to file a timely notice of appeal. *Osterneck*, 489 U.S. at 179; *Thompso*n, 375 U.S. at 386–87. The "unique circumstances" doctrine permits us to consider a late-filed Rule 59(e) motion in determining appellate jurisdiction. In this case, we conclude that Charles's untimely appeal falls within the narrow parameters of the unique circumstances doctrine and, as such, her appeal is deemed timely. Therefore, we have jurisdiction to consider her appeal.

## B. *Merits*

On the merits, Charles argues that the "pivotal issue" in her case is "how many hours out of an eight hour workday can she be on her feet." She argues that her treating physician, Dr. Rock, limited her to standing no more than four hours per day, thus taking her out of the light exertional work classification.[4] She argues that the ALJ improperly discounted Dr. Rock's determination of her limitations and wrongfully credited the opinions of the four consulting doctors who evaluated her only once or only reviewed her records.[5]

---

[4] The ALJ determined that Charles could perform work in the light exertional work classification, which generally requires a person to be able to stand/walk for six hours in an eight-hour day.

[5] She also argues briefly that the Commissioner, at step five of the sequential evaluation, bears the burden of proving that she "retains" the necessary RFC to perform other work in the national and regional economy. Charles is incorrect that the Commissioner has to prove that Charles "retains" her RFC. As the Commissioner notes, in *Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004), we clarified that while the burden of production at step five shifts to the Commissioner, the ultimate burden of persuasion rests with the claimant. *See also* 68 Fed. Reg. 51153 (Aug. 26, 2003). As such, the Commissioner does not have to reestablish Charles's RFC–what Charles proved at step four continues as her RFC at step five. However, the burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that Charles could perform, given her RFC.

Our standard of review is narrow. We review de novo a district court decision upholding the denial of social security benefits. *Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001)*; Pettit v. Apfel*, 218 F.3d 901, 902 (8th Cir. 2000). "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id*. If, after reviewing the record, the Court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). Even if we would have weighed the evidence differently, we must affirm the denial of benefits if there is enough evidence to support the other side. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

Substantial evidence supports the Commissioner's denial of benefits in Charles's case. Charles focuses her argument on the apparent inconsistency between Dr. Rock's assessment of her ability to stand for four hours, and the four other consulting physicians' opinions that her standing was not limited to four hours in an eight-hour day. "Although 'a treating physician's opinion is generally entitled to substantial weight,' such opinion 'does not automatically control, since the record must be evaluated as a whole.'" *Cruze v. Chater*, 85 F.3d 1320, 1324–25 (8th Cir. 1996) (quoting *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995) (internal citations omitted)). A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements. *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996); *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991).

Generally, if a consulting physician examines a claimant only once, his or her opinion is not considered substantial evidence, especially if the treating physician

contradicts the consulting physician's opinion. *Lauer*, 245 F.3d at 705; *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). However, "an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." *Harris*, 356 F.3d at 931 (citing *Freeman v. Apfel*, 208 F.3d 689, 692 (8th Cir. 2000); 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)). The regulations further provide that "if we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527.

Given these guidelines, we must first decide whether Dr. Rock's determination that Charles could stand no more than four hours in an eight hour day is supported by "medically acceptable clinical and laboratory techniques." The ALJ determined that it was not, and we agree. Dr. Rock first treated Charles after she injured her lower back and neck at work in 1992. Charles eventually underwent surgery for that injury, and she continued to see Dr. Rock as her primary care physician. From 1993 to 1996, Charles reported intermittent shoulder and back pain, but she continued working in a light exertional capacity during that time. Beginning in 1996, Dr. Rock treated Charles for fatigue by giving her B12 shots and prescribing Synthroid. Most of Dr. Rock's record notations from 1996 forward deal with that treatment. In late 1996, Dr. Rock referred Charles to a rheumatologist due to her complaints of joint pain in her feet, hands, shoulder, and thigh. The rheumatologist determined that Charles suffered from osteoarthritis and degenerative joint disease associated with deconditioning–he prescribed water therapy. Charles began therapy but reported increased shoulder pain, to which Dr. Rock suggested that Charles "work through it" at therapy.

Following the denial of her first application in April 1998, Charles returned to Dr. Rock in August 1998 complaining of lower back pain. Dr. Rock acknowledged that this had been a chronic condition following her injury and surgery in the early

1990s. He prescribed pain medication. Thereafter, the next report from Dr. Rock was his April 30, 1999, letter response to Charles's attorney. Dr. Rock advised that he "would not disagree" with the restrictions provided by Dr. Jedlicka, a consulting physician, but stated, "I would add that at my last evaluation of Ms. Charles, I did advise that she not stand for more than 4 hours per workday. Initially, when she returned to work, she should limit it to a 4-hour workday until such time that she has had to acclimate."

The record to which Dr. Rock referred involved Dr. Jedlicka's consultative examination and test. Charles reported a history of left leg problems (which no longer bothered her), neck problems (improved somewhat with physical therapy), and recurrent intermittent low back problems. Her clinical tests showed few problems, and her diagnostic tests indicated that she suffered from degenerative changes in her spine. Dr. Jedlicka assessed her with cervical and lumbar strains, and he limited her functioning but did not restrict the amount of time she could stand in a day as long as she could change positions.

Given this evidence, Dr. Rock's assessment of Charles's inability to stand no more than four hours a day is not supported by substantial evidence. None of Dr. Rock's records following Charles's onset date note any such restrictions. Furthermore, the history of Charles's back and arthritis problems indicates that her condition was controlled mostly with medication and some restriction on her daily activities. However, Dr. Rock never reported any severe problems, particularly any restrictions for standing and walking. Dr. Rock's opinion was conclusory and unsupported by medical findings. The consultative physicians relied upon objective test results. Therefore, the ALJ had discretion to rely on the consulting physicians' opinions to determine Charles's limitations. Here, these physicians determined that Charles could stand for at least six hours in a work day, thus placing her in the light exertional work category. Based on the foregoing, we conclude that substantial evidence supports the

-11-

ALJ's determination that Charles could perform light work and is, therefore, not entitled to Social Security disability benefits.

HEANEY, Circuit Judge, dissenting.

I believe that our only option in this case is to remand to the ALJ for a determination as to whether the Commissioner has met her burden in determining whether Sandra Charles is able to do light work in a standing position for six hours. While the magistrate judge and the district court judge agreed that this is the key issue, they reached contrary results; the former finding that Charles is disabled, and the latter finding that she is not.

The district court put the matter well when it stated that the key factual issue is the amount of time that Charles can stand on her feet for six hours out of an eight-hour work day. Dr. Rock, Charles's treating physician over several years, made it clear that Charles should not stand for more than four hours each work day. The vocational expert agreed that if that were the case, then Charles would in fact be disabled. Dr. Jedlicka, who conducted an orthopedic examination of Charles for the Commissioner, stated: "She can stand, walk and sit for 10 minutes at a time, but then must change positions." (R. at 416 (emphasis added).) Dr. Pecoraro apparently concurred in that statement. (R. at 437.)

Try as I may, I am unable to find anything in the record indicating that the jobs described by the vocational expert as being suitable for Charles would permit a person to alternately stand and sit on the job. The district court judge interpreted Dr. Jedlicka's and Dr. Pecoraro's reports as agreeing that Charles is able to stand on her feet for at least six hours in an eight-hour day as long as she can move around. I question whether that is the correct interpretation of their testimony. In my view, the doctors were stating that Charles could only work a six- to eight-hour day if she could alternately sit and stand. Dr. Steiner, the neutral expert, testified as follows:

Generally I think this record describes someone lifting at the ten pound level. I don't think I'd limit time on feet if it involved an ability to move around some. <u>Sitting would be limited to ten to fifteen minutes as would standing in place.</u> I think repetitive neck motions would be precluded. As would repetitive bending, twisting and stooping and kneeling and crawling. So those are the kinds of limitations I think this record would describe.

(R. at 70 (emphasis added).) As I read his testimony, it is unclear whether Dr. Steiner was envisioning a job in which Charles would be able to sit at times and thus relieve the burden on her feet. It is inherently wrong to deny Charles's a disability finding unless Drs. Jedlicka, Pecoraro, and Steiner each has a chance to clarify his testimony.

My view of this case is supported by Charles's own testimony, and the hypothetical question posed by the ALJ to the vocational expert. Using the same language as Dr. Steiner, the ALJ appeared to inquire about jobs in which Charles would be able to sit and stand in intervals. The vocational expert does not indicate whether there are jobs available where Charles would be able to move between the sitting and standing position. In addition, Charles stated at the hearing that she "can't stand for very long." (R. at 57.) This directly contradicts the district court's conclusion that she can stand for six hours in an eight-hour day and supports my reading of the record that she needs to alternate between sitting and standing as she works.

I believe that if Charles is required to be on her feet six out of eight hours each day that she will be unable to perform her job, even if she is able to change her standing position from time to time. Rather than deny a fifty-seven year old woman, with an excellent work record from 1981 to 1995, social security disability benefits based on an incomplete record, we should remand to the ALJ with directions to recall Drs. Jedlicka, Pecoraro, and Steiner, as well as the vocational expert, to determine

whether Charles can work six hours out of an eight-hour day if she must stand on her feet the entire period of time without the opportunity to alternately sit and stand.

_____