# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3582

_____

Maria Antoinette Randolph,      *
                           *
        Appellant,        *
                           *   Appeal from the United States
   v.                        *   District Court for the
                           *   District of Nebraska.
Jo Anne B. Barnhart, Commissioner,    *
Social Security Administration,       *
                           *
        Appellee.         *

_____

Submitted: June 17, 2004
Filed: September 13, 2004 (Corrected 9/22/04)

_____

Before BYE, BOWMAN, and MELLOY, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Maria Randolph appeals from a judgment of the District Court[1] affirming the decision of an administrative law judge ("ALJ") denying her disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act"). See 42 U.S.C. §§ 423 & 1382 (2000). Because the ALJ's decision is supported by substantial evidence in the record, we affirm.

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

Randolph applied for DIB and SSI benefits in November 1999, alleging that she became disabled on October 1, 1999. Her application for benefits was denied, and she then requested a hearing before an ALJ.[2] She received such a hearing in March 2001. Two months later the ALJ issued his decision denying Randolph both DIB and SSI benefits because she was not under a "disability" as that term is defined in the Act. See 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A) (defining "disability" for DIB and SSI purposes). In July 2002, the Appeals Council denied Randolph's request for review, so the ALJ's decision became the final decision of the Commissioner. Randolph sought review in the District Court,[3] which affirmed the denial of benefits. Randolph appeals.

In her application for benefits, Randolph, then 41 years old, alleged that she was disabled due to shortness of breath, chest pains, and obesity. From September through December 1999, Randolph sought treatment for a variety of physical complaints at the Medical Center of Louisiana – New Orleans ("MCLNO"). Despite her repeated complaints of shortness of breath and chest pains, physical examinations and tests did not reveal any cardiac or pulmonary abnormalities.

On December 8, 1999, Randolph first sought treatment for depression at the Central City Mental Health Clinic ("CCMHC"), where she saw Dr. Melanie Vega, M.D., for the first time. During this initial meeting, Vega noted that Randolph had

---

[2]Randolph initially applied for benefits while living in Louisiana. At the time of her application, Louisiana was one of ten states in a prototype Social Security Administration program that eliminated the reconsideration level of appeal for applicants who were initially denied benefits under the Act. See Modifications to the Disability Determination Procedures; Disability Claims Process Redesign Prototype, 64 Fed. Reg. 47,218 (Soc. Sec. Admin. Aug. 30, 1999).

[3]While her appeal to the Appeals Council was pending, Randolph moved from Louisiana to Nebraska. Nebraska is thus a proper forum for this suit. 28 U.S.C. § 1391(e) (detailing venue requirements for suits brought against federal agencies).

difficulty sleeping, poor appetite, anhedonia,[4] difficulty concentrating, and poor memory. Randolph admitted that she thought about dying, but she denied a present plan or intent to commit suicide. Randolph further denied auditory hallucinations, and, although Randolph reported seeing black shadows, Vega concluded that there was no evidence of psychosis or mania. Randolph saw Vega again on January 5, 2000 and explained that she was "doing fine." CCMHC, Progress Notes (Jan. 5, 2000). Randolph reported good appetite, but admitted to seeing shadows and suffering from poor concentration. She again denied any suicidal intent. Two weeks later, Randolph returned to Vega and this time she reported auditory hallucinations and poor concentration. Vega noted "intermittent depression [and] [suicidal intent]" but went on to report that Randolph "[d]enies current [suicidal intent]." CCMHC, Progress Notes (Jan. 19, 2000). At the end of January, Vega completed a checklist indicating that Randolph exhibited nine symptoms of depressive syndrome, had extreme restrictions on the activities of daily living, had extreme difficulty maintaining social functioning, had constant deficiencies of concentration, persistence or pace, and had experienced repeated episodes of decompensation in a work setting.[5] Melanie Vega, M.D., Disability Checklist at 1–2 (Jan. 31, 2000). Randolph next met with Vega on March 13, 2000. Vega's notes from this meeting indicated that Randolph had difficulty sleeping and anhedonia but once again denied suicidal intent. One week later, Vega wrote a letter to the Social Security Administration ("SSA") opining that Randolph suffered from a "Major Depressive disorder, severe, with psychotic features" and concluded that Randolph was unable to work at the present time. Melanie Vega, M.D., Letter (March 20, 2000).

---

[4]Anhedonia is "[a] marked decrease in the pleasure of living or of being alive; a loss of appreciation for activities which are normally pleasurable . . . ." J.E. Schmidt, M.D., 1 Attorneys' Dictionary of Medicine and Word Finder at A-373 (perm. ed. rev. vol. 2003).

[5]This checklist mirrors the listing for affective disorders that was in effect at the time, see 20 C.F.R. Pt. 404, subpt. P, app. 1 § 12.04 (1999), which has subsequently been amended.

While being treated by Vega, Randolph was also examined by other medical experts. In December 1999, Dr. Sheldon Hersh, an internist, examined Randolph. Although Randolph complained of shortness of breath, Hersh concluded, after examining her and reviewing the results of cardiac and pulmonary studies, that she did not suffer from any cardiac or pulmonary problems. Hersh opined that Randolph had a major depressive disorder, which imposed some constraints on her activities of daily living and limited her ability to work in a stressful environment. In February 2000, Randolph was examined by Dr. Alvin Cohen, M.D., a psychiatrist. He diagnosed "Major Depression with Psychotic Features, by history, in remission, by history." Alvin Cohen, M.D., Psychiatric Evaluation at 3 (Feb. 8, 2000). In contrast to Vega, Cohen opined that the disorder did not markedly impair Randolph's ability to perform the usual activities of daily living. He did note that Randolph had limited social functioning but determined that it was not markedly impaired. He noted that she had adequate memory and concentration, but that she would withdraw from stressful situations. In addition to these medical evaluations, Randolph was examined in June 2000 by Christina Scott, a psychologist. Among other symptoms, Randolph reported sleep disturbance, depressed mood, social withdrawal, and auditory and visual hallucinations. Psychological tests revealed that Randolph had normal visual-motor functioning, that her intelligence was in the low end of the average range, that she had below-average long-term memory, and that she had below-average social reasoning and judgment. Scott diagnosed "Major Depressive Disorder, with Psychotic Features." Christina Scott, Psychological Evaluation at 2 (June 19, 2000).

At the hearing before the ALJ, Randolph testified to her physical and mental complaints and to her ability to perform certain specific tasks. She indicated that her inability to focus was the main problem that was keeping her from working. She also reported that she occasionally had memory problems. She claimed that she initially sought treatment at CCMHC because she "always wanted to kill [herself]." Soc. Sec. Admin. Office of Hearings & Appeals, Hearing at 7 (March 8, 2001). She further testified that she was lonely, craved isolation, slept to avoid her problems, and had

-4-

difficulty getting along with others. She claimed that she suffered from knee and back pain after about thirty minutes of sitting and that her knee pain prevented her from bending, crawling or stooping. She also claimed that she could only stand for a limited period of time or else would suffer muscle spasms in her calves. She again complained of shortness of breath, which made her unable to walk any farther than a block. She testified that she had been hospitalized in October 1999 because of her breathing problems. She maintained that she had become unable to wash dishes or cook and that she only left her house to go to doctor's appointments. Nonetheless, she was still able to use public transportation.

The ALJ then took the testimony of a vocational expert ("VE"). The ALJ asked whether a forty-two-year-old with a GED, capable of medium work, but unable to deal with stressful situations and required to avoid interaction with the public and extended standing or walking, could perform any of Randolph's past relevant work. The VE equivocated and noted that a telemarketing position would require phone contact with the public, but it would otherwise meet the restrictions. The VE also indicated that Randolph's other prior jobs, in retails sales and as a nursing assistant, would also involve interaction with the public. The ALJ then asked the VE whether there were nonetheless other positions in the national or regional economy that Randolph could perform. The VE testified that Randolph could work as a food preparation worker, a hand packager, an unskilled assembly worker, or a sewing machine operator. Upon cross-examination, the VE testified that a substantial loss of ability to understand and carry out simple instructions would impair the ability to perform the listed jobs. He also testified that a substantial impairment in ability to respond appropriately to supervision and to work situations might preclude someone from maintaining employment.

In his written decision, the ALJ denied Randolph's claims for DIB and SSI benefits. He worked through the five-part sequential analysis to determine whether Randolph was eligible for benefits. See 20 C.F.R. §§ 404.1520(a)(4)(i)–(v) &

416.920(a)(4)(i)–(v) (setting forth the five-step sequential evaluation process for DIB and SSI claims). The ALJ first determined that Randolph had not performed any substantial gainful activity since the date of the onset of her alleged disability. At the second step, the ALJ determined that Randolph did suffer from a "severe impairment," i.e., depression. See 20 C.F.R. §§ 404.1520(c) & 416.920(c) (defining a "severe impairment" as an "impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities"). The ALJ nonetheless found at the next step that Randolph's impairment was not of listing level. See 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04 ("Affective Disorders"). At the fourth step, the ALJ determined that Randolph had the residual functional capacity ("RFC") to perform medium work, so long as it avoided stressful situations or interaction with the public and limited extended periods of walking or standing. In light of this RFC determination, the ALJ determined that Randolph could return to her past relevant work as a telemarketer. Providing a second holding for his decision, the ALJ then moved on to the final step of the sequential analysis and determined that, even if Randolph could not return to her past relevant work as a telemarketer, in light of her RFC, age, education and work experience, she could adjust to other work as a food preparer, hand packer, assembler, or sewing-machine operator.

Although we review de novo a district court's decision to uphold the denial of benefits, we give great deference to the underlying decision of the Commissioner. Charles v. Barnhart, 375 F.3d 777, 782 (8th Cir. 2004). We will affirm the Commissioner's decision so long as it is supported by substantial evidence on the record as a whole. Id. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." Reutter v. Barnhart, 372 F.3d 946, 950 (8th Cir. 2004). Even if substantial evidence supports a contrary outcome, we may not reverse so long as the Commissioner's decision also is supported by substantial evidence. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).

Randolph argues that the ALJ erred by discrediting the opinions and findings of Dr. Vega, Randolph's treating physician. Under the applicable regulations, the ALJ will give "a treating source's opinion on the issue[s] of the nature and severity of [an] impairment[]" controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2). The ALJ did not give Vega's opinion controlling weight because "the weight of all the objective medical evidence of record, including from the mental health clinic [CCMHC], does not support Dr. Vega's opinion that claimant is unable to work." Soc. Sec. Admin. Office of Hearings and Appeals, Decision at 4 (May 23, 2001); see also Prosch v. Apfel, 201 F.3d 1010, 1013–14 (8th Cir. 2000) ("It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record."). Substantial evidence supports the ALJ's refusal to give Vega's opinion controlling weight.

The ALJ did not reject Vega's opinion in toto. At the second step of the sequential analysis, he determined that Randolph's depression was a severe impairment. This decision is supported by substantial evidence on the record; all of the medical sources, both treating and examining, determined that Randolph suffered from a major depressive disorder. The ALJ accepted that Randolph's depression was a severe impairment but rejected Randolph's contention that it was sufficient to meet listing level. The ALJ did not err in refusing to give Vega's disability checklist or her opinion that Randolph was unable to work controlling weight. The checklist mirrored the affective disorder listing in effect at the time it was completed, see 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04 (1999), and determining whether an individual's impairment reaches listing level is not an issue in which the opinion of a treating source is given controlling weight. See 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2) (noting that the final responsibility for determining whether an impairment reaches listing level is for the Commissioner); Soc. Sec. Ruling 96-5p ("[T]reating source

opinions on issues that are reserved to the Commissioner are *never* entitled to controlling weight.") (emphasis added). Similarly, Vega's March letter in which she opined that she did not believe Randolph was able to work is not entitled to controlling weight as a medical opinion of a treating source. See Soc. Sec. Ruling 96-5p (noting that such an opinion, even when given by a treating source, "can never be entitled to controlling weight or given special significance"). When she filled out the checklist, Vega had only met with Randolph on three prior occasions. Cf. 20 C.F.R. §§ 404.1527(d)(2)(i) & 416.927(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The treatment notes from these sessions do not indicate that Vega had sufficient knowledge upon which to formulate an opinion as to Randolph's ability to function in a workplace. Vega's assertion that Randolph had suffered repeated episodes of decompensation in the workplace is not supported anywhere in the record.[6] Furthermore, Vega never treated Randolph during any period of employment and her treatment notes do not provide any evidence that she even asked Randolph about her prior experience in the workplace or her current ability to maintain employment.

Substantial evidence supports the ALJ's finding that the objective medical evidence of record did not support Vega's summary conclusions about Randolph's inability to work. The ALJ carefully considered all of the medical evidence in the record, from Vega and from examining sources, when he determined that Randolph's impairment did not meet the criteria set forth in paragraph B of Listing 12.04.[7] In

---

[6]Vega refers to an "episode of dealing inappropriately with others" but the record illustrates that this episode did not involve a workplace but rather an altercation between Randolph and an individual who had threatened Randolph at CCMHC. J. Hill, SSC, Progress Notes (Resocialization Group) (Jan. 19, 2000).

[7]The ALJ determined that Randolph did not meet the criteria of paragraphs A or B. Because we determine that the ALJ's decision as to paragraph B is supported by substantial evidence we do not need to address the paragraph A criteria.

addition to the symptoms of depressive disorder required by paragraph A, paragraph B of the listing requires the disorder result in at least two of the following: "1. [m]arked restriction of activities of daily living; or 2. [m]arked difficulties in maintaining social functioning; or 3. [m]arked difficulties in maintaining concentration, persistence, or pace; or 4. [r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04(B). The conclusions from the various medical sources that Randolph had a major depressive disorder that met DSM-IV criteria do not mandate that the ALJ conclude the disorder reached listing level because the DSM-IV criteria do not address the specific requirements set forth in Listing 12.04. Compare id. with American Psychiatric Ass'n, DSM-IV-TR, Criteria for Major Depressive Episode at 356 (4th ed. 2000). The only evidence that Randolph met the paragraph B criteria is Vega's cursory checklist. Furthermore, evidence from all the other examining sources supports the ALJ's conclusion that Randolph's depression did not impair her functioning to the extent required under Listing 12.04. Hersh found that Randolph had a constriction on the activities of daily living but did not indicate that there was a marked restriction on such activities. He did not find any difficulties with social functioning, concentration or prior episodes of decompensation although he did note that work in a stressful environment would be difficult for Randolph. Similarly, Cohen agreed with the diagnosis of major depressive disorder,[8] but did not find that it resulted in any of the paragraph B criteria. See Alvin Cohen, M.D., Psychiatric Evaluation (Feb. 8, 2000) (finding that Randolph's ability to perform the usual activities of daily

---

[8]Cohen opined that Randolph suffered from a "major depressive disorder, with psychotic feature, in remission" at the time of his examination. Randolph argues that "in remission" in this diagnosis refers only to the psychotic features portion of the diagnosis. This is contrary to the DSM-IV framework, which follows specific diagnostic codes that clearly indicate that the "in remission" language refers to the depressive disorder. See American Psychiatric Ass'n, DSM-IV-TR at 370–71 (4th ed. 2000) (explaining the diagnostic codes for major depressive disorder and clarifying that the "in remission" language refers to the current clinical status of the major depressive disorder).

living was not markedly impaired, that she had limited social functioning, that she had adequate concentration, and no episodes of extended decompensation). Like Hersh, Cohen noted that Randolph would have difficulty adapting to stressful situations but did not indicate that her disorder would impose other limits on her ability to work. Scott also concluded that Randolph suffered from a major depressive disorder but the results of Scott's tests do not show that Randolph's disorder met the requirements of paragraph B. Her social reasoning and judgment on the Wechsler Adult Intelligence Scale-Revised scored slightly below average but were not abnormal. Scott noted that the depressive symptoms appeared to interfere with Randolph's concentration, but nothing in the tests indicates that Randolph suffered marked difficulties of concentration. Substantial evidence in the record supports the ALJ's conclusion that Randolph's impairment did not meet the requirements of Listing 12.04.[9]

Randolph's final argument is that the ALJ erred in discounting her testimony about the limitations imposed by her impairments. She argues that the ALJ failed to evaluate her credibility in accordance with the requirements set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). We note that Polaski sets forth requirements for ALJs within the Eighth Circuit. The ALJ in this case is based in Louisiana, within the Fifth Circuit, and thus is not bound to follow Polaski.[10] Nevertheless, the ALJ reviewed Randolph's testimony in light of the applicable regulations which largely mirror Polaski, compare id. with 20 C.F.R. §§ 404.1529(c)(3)(i)–(iv), (vii) & 416.929(c)(3)(i)–(iv), (vii), and partially discredited

---

[9]Randolph also argues that the hypothetical question posed to the VE by the ALJ was defective because it did not incorporate all the limits on Randolph's ability to function in the workplace set forth by Vega in her disability checklist. Because the ALJ properly determined that these limitations were not supported by the medical evidence of record, he was not required to include such limitations in the hypothetical posed to the VE. Pearsall v. Massanari, 274 F.3d 1211, 1220 (8th Cir. 2001).

[10]We note that the Polaski decision has never been cited in the Fifth Circuit.

it. Soc. Sec. Admin. Office of Hearings & Appeals, Decision at 5 (May 23, 2001). The ALJ's credibility determination did not violate the Polaski requirements. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (noting that acknowledgment of the Polaski factors, even without rigidly analyzing a claimant's testimony thereunder, may be sufficient to meet the requirements of Polaski). We believe that substantial evidence supports the ALJ's conclusion that Randolph's testimony about the limitations imposed by her physical and mental impairments was exaggerated and inconsistent with the medical evidence in the record. Randolph repeatedly complained of shortness of breath in emergency-room visits but cardio-pulmonary tests and studies did not reveal any significant cardio-pulmonary abnormalities. See Albert Hendler, X-Ray #M7470 (Jan. 4, 2000); MCLNO, X-Ray Report (Dec. 13, 1999); MCLNO, Pulmonary Function Report at 4 (Nov. 5, 1999); Jihad Mustapha, Stress Echocardiogram (Oct. 6, 1999); Mary Lobrano, X-Ray Report (Oct. 2, 1999). Randolph also testified to limitations on her ability to bend and move, but medical examinations revealed only slight restrictions on these abilities. Hersh noted that Randolph was able to get on and off the examining table without assistance, that she did not exhibit any signs of back pain, and that her gait was normal. Sheldon Hersh, Internal Medicine Consultative Examination at 3 (Dec. 29, 1999). In contrast to Randolph's testimony regarding her purportedly limited ability to care for herself, Cohen determined that her depressive disorder did not markedly impair her ability to perform the usual activities of daily living. In light of these inconsistencies between Randolph's testimony and the medical evidence in the record, the ALJ did not err in partially discrediting the testimony. See 20 C.F.R. §§ 404.1529(a) & 929(a) (recognizing that "alleged functional limitations and restrictions due to pain and other symptoms" must be accepted by the ALJ only to the extent that they can "reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence"). Nor did the ALJ err in failing to find that Randolph's obesity sufficiently impaired her RFC to such an extent that she was unable to work. Although Randolph's obesity was well supported in the medical record, the medical evidence does not support her claim that it precluded her from employment. The ALJ's finding

-11-

that Randolph's testimony about her limitations was only partially credible is, we conclude, supported by substantial evidence.

For the reasons stated, we affirm the denial of benefits.

_____