**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 8, 2010
Decided August 26, 2010

**Before**

WILLIAM J. BAUER, *Circuit Judge*

KENNETH F. RIPPLE, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 10-1493

| | |
|---|---|
| CATHY A. MOLNAR,<br>　　　*Plaintiff-Appellant*,<br><br>　　　　*v.*<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br>　　　*Defendant-Appellee*. | Appeal from the United States District Court for the Western District of Wisconsin.<br><br>No. 3:09-cv-00522-bbc<br><br>Barbara B. Crabb,<br>*Judge*. |

**O R D E R**

Cathy Molnar claims that she is disabled by degenerative disc disease. The Social Security Administration denied her application for benefits after an Administrative Law Judge ("ALJ") concluded that her impairment is severe but not disabling. Ms. Molnar argues that the ALJ erroneously concluded that her disc disease is not per se disabling. Alternatively, she contends that the ALJ improperly discredited her complaints of pain when determining her residual functional capacity. Because the ALJ's decision is supported by substantial evidence in the record, we uphold the finding that Ms. Molnar is not disabled.

Ms. Molnar applied for disability insurance benefits and supplemental security income in February 2006. She had been laid off from her job as an administrative assistant in March 2005, and she claimed that after September 2005 she could no longer work due to degenerative disc disease. Ms. Molnar, who is 54 years old, has a high school education and previous work experience as a waitress, bartender and car salesperson.

Ms. Molnar's medical issues began in 1997 when she injured her neck in a car accident and had corrective surgery. She returned to work full time, though in 2002 an MRI revealed degenerative changes in her lumbar spine and mild slippage of the vertebrae at the L4-5 level. Surgery was recommended, but Ms. Molnar declined. She continued to experience pain, which over time spread from her lower back to her legs. Then in September 2005, after she was laid off, Ms. Molnar sought treatment from Dr. Jamie Pearson, who noted tenderness in her lower back but observed that she walked without difficulty and retained normal lateral motion and strength in her lower extremities. The doctor diagnosed her with degenerative arthritis of the lumbar spine and prescribed pain medication. Two epidural steroid injections reduced inflammation in her lower back, and Ms. Molnar reported that her pain had been cut in half.

In late 2005, Ms. Molnar also was experiencing increasing pain in her neck and upper extremities. An MRI revealed degenerative discopathy in the cervical spine. A neurosurgeon, Dr. Robert Roach, observed during a November consultation that Ms. Molnar walked with a mildly spastic gait yet exhibited normal motor strength in her lower extremities and nearly normal motor strength in her upper extremities. He diagnosed cervical myelopathy related to spinal stenosis and recommended surgery.

That same month Ms. Molnar had cervical fusion surgery, the same procedure used after her 1997 accident. Just a few weeks later she reported to Dr. Roach that the pain in her neck and upper extremities was gone. She was walking normally and had regained full motor strength in her upper and lower extremities. In December 2005, a month after the surgery, Ms. Molnar reported to Dr. Thomas Hinck, her primary physician, that she was "doing really well" with her cervical issues. A.R. 152. She noted continuing tenderness in her shoulders, but said that the numbness in her arms had diminished. The pain in her lower back had not subsided completely, but Ms. Molnar declined a refill of her pain medication, which she had been taking only occasionally. Just over a month later, however, Ms. Molnar applied for benefits.

Ms. Molnar returned to Dr. Hinck in April 2006 and reported that her lower back pain had worsened. He reviewed a new MRI and diagnosed her with degenerative lumbar spine disease, prescribed a pain killer and steroid, and recommended that she consult an orthopedic surgeon. Ms. Molnar consulted with two orthopedic surgeons, and both recommended fusion surgery to repair her lumbar spine. Both surgeons observed that Ms. Molnar walked with an

abnormal gait and complained of pain when bending forward, but her strength in all muscle groups, the reflexes in her knees and ankles, and her performance on a straight-leg raising test were all normal. In July 2006, Dr. Joseph Perra performed a spinal fusion in Ms. Molnar's lower back.

That surgery was a success. A month later Ms. Molnar told Dr. Perra that she felt "wonderful" and could walk without pain for the first time in 15 years. A.R. 226. The surgeon confirmed that she was walking with a normal gait. He recommended physical therapy, and at her first session the therapist observed that Ms. Molnar could rise from a chair without difficulty, was able to move her neck freely and did not have obvious limitations. She had diminished strength in her right foot, but otherwise her strength in her lower extremities was normal. At her third session, Ms. Molnar expressed satisfaction with her progress and reported that she was able to do light yard work and function throughout the day. She added that she had spent two hours searching for agates in a gravel pit without experiencing any pain. In September 2006, she told the therapist that she was driving more and had experienced some stiffness in her neck as a result, but her lower back remained "quite good," and she had been very active. A.R. 215. Ms. Molnar saw Dr. Perra in October 2006 and was able to move comfortably and had full strength in her lower extremities. Six months after her surgery, Ms. Molnar did not report any pain aside from occasional tenderness at the base of her spine and was able to bend forward 20 degrees without pain. Her gait was normal. One year after her surgery, in June 2007, Ms. Molnar reported no back pain, walked with a normal gait, and could bend forward without pain.

In November 2007, however, Ms. Molnar complained to Dr. Perra about increasing levels of pain in her arms and neck with numbness and tingling. Dr. Perra noted a diminished range of motion in the neck but also observed that Ms. Molnar retained full strength in her upper extremities. An MRI revealed some stenosis and a central disc herniation. Dr. Perra recommended a third cervical surgery, but Ms. Molnar decided to wait.

In December 2007, Dr. Hinck provided a list of work restrictions in connection with Ms. Molnar's claim for benefits. He reported that she could occasionally lift from the floor up to 20 pounds, frequently lift from a table up to 20 pounds, frequently carry up to 20 pounds for less than 30 feet and occasionally carry up to 20 pounds for more than 30 feet. She could frequently push, pull and reach below shoulder level, but Dr. Hinck recommended against bending, climbing, crawling, duck walking, squatting, overhead lifting, or reaching at or above the shoulder. Additionally, he believed, Ms. Molnar could frequently engage in fine manipulation and simple grasping with both hands. He opined that Ms. Molnar would not need to lie down during an eight-hour day but would miss on average two days of work per month. During an eight-hour day, she would need to change positions frequently and could sit for five hours at most, stand for no more than three hours, and walk no more than three

hours.  Finally, he restricted Ms. Molnar from all activities involving unprotected heights and rotation of the head and neck, and limited her to only occasional side-to-side bending and rotation of the upper body.

Ms. Molnar next saw Dr. Perra for neck pain in April 2008.  She had stable reflexes and full strength in her upper extremities but diminished range of motion in the neck and increased misalignment of her cervical vertebrae.  Dr. Perra again recommended surgery, and Ms. Molnar had her third cervical surgery in May 2008.  In July 2008, six weeks after the surgery, she reported to Dr. Perra that the pain in her neck and arms was gone, as was the associated numbness and tingling.  Dr. Perra concluded that she now had full strength in her upper extremities but still had a limited range of motion in her neck.  He  suggested isometric strengthening exercises and home activities such as lawn mowing and easy driving.

The ALJ conducted an evidentiary hearing in October 2008.  Ms. Molnar testified that she had tried returning to work as an administrative assistant in 2006 but could not perform the job because she was unable to reach or tilt her head upward.  She reported a need to move frequently and stated that she has difficulty bending because of pain in her lower back.  Since her third neck surgery, she continued, she had experienced numbness in her hands and diminished strength in her arms.  She cannot push or pull.  During the day, she said, she lies down a lot.  She reads, cares for her dogs and cats, shops for groceries, cooks, gardens and drives limited distances.

The ALJ called Dr. Harold Mills to testify as a medical expert.  Dr. Mills opined that Ms. Molnar has severe cervical and, to a lesser extent, lumbar discogenic disease.  Initially he said that Ms. Molnar's disc disease met the elements in Listing 1.04(A) for a disabling disorder of the spine.  But when the ALJ probed Dr. Mills about the criteria for meeting that listing and asked whether there was evidence of motor loss accompanied by sensory or reflex loss, the doctor responded that he could not give a specific answer and did not know Ms. Molnar's current status.  He conceded that he had "not recorded any specific evidence of motor loss" but recalled that in November 2005 and May 2008 she had experienced gait problems, which, he thought, indicated some motor loss.  A.R. 261.  He also noted that in November 2005 she had reported numbness in her hands.  But all of those instances, he acknowledged, were before surgery.  Ms. Molnar's attorney did not follow up with additional questions about the listing or point out other evidence of motor loss.

The ALJ also heard from Sidney Bower, a vocational expert.  He testified that a person with the restrictions imposed by Dr. Hinck could not perform Ms. Molnar's past work.  At first Bower said there were no jobs in the national or regional economy for a similarly restricted person of Ms. Molnar's age, education and work history.  But when the ALJ iterated that the hypothetical allowed for occasional trunk motion, frequent simple grasping, and driving,

Bower revised his opinion to allow for work as a ticket taker, parking-lot attendant, optical lens matcher, or optical salvager. These jobs, Bower said, exist in substantial numbers in the regional economy.

The ALJ rejected Ms. Molnar's claim using the standard five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one the ALJ determined that she had not engaged in substantial gainful activity since her reported onset, and at step two that her degenerative disc disease of the cervical and lumbar spine with a history of multiple surgeries constitutes a severe impairment. At step three, the ALJ determined that Ms. Molnar's impairment does not meet or equal a listed impairment, explaining that she did not meet Listing 1.04 because Dr. Mills had "emphasized that there was no evidence of motor loss." A.R. 12. At step four the ALJ concluded that Ms. Molnar retained the residual functional capacity to do light work with the additional restrictions detailed by Dr. Hinck: no bending forward, climbing, crawling, or squatting; no rotating of the head or neck and only occasional rotation of the upper body and side bending; no reaching at or above shoulder level or working at unprotected heights, and no sitting for more than five hours during an eight-hour day or standing or walking for more than three hours in an eight-hour day. Here, the ALJ noted that medical evidence partly corroborated Ms. Molnar's complaints of pain, though several progress notes from her physicians verified that she had improved and was doing well after her surgeries and epidural injections. The ALJ detected no evidence that Ms. Molnar's condition had significantly worsened since early 2006 when she acknowledged to doctors a significant range of activities. Ms. Molnar had testified that she must lie down frequently throughout the day, but that testimony, the ALJ observed, was contradicted by the assessment of Dr. Hinck--Ms. Molnar's treating physician--that she would not need to lie down during a typical workday. Finally, at step five, the ALJ concluded that Ms. Molnar could no longer perform her past work but could do other jobs and thus was not disabled. After the Social Security Appeals Council declined to review the decision, Ms. Molnar sought review in the district court. The district court upheld the decision of the ALJ.

Because the Appeals Council declined review, the ALJ's ruling is the final decision of the Commissioner of Social Security. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). We will uphold that decision if it is supported by substantial evidence and rests on appropriate legal standards. *See* 42 U.S.C. § 405(g); *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008). We will not reweigh the evidence or substitute our judgment for that of the ALJ. *Ketelboeter*, 550 F.3d at 624; *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

Ms. Molnar first challenges the ALJ's conclusion that her impairments do not meet Listing 1.04(A) for disorders of the spine. She contends that the ALJ disregarded an opinion from Dr. Mills that she did meet this listing and misstated his testimony in concluding that there was no evidence of motor loss. A claimant is presumed disabled if she has an impairment

that meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. §§ 404.1520(d); 404.1525(a); 20 C.F.R. Pt. 404, Subpt. P, App. 1. To meet Listing 1.04(A), a claimant must present evidence of a spine disorder that results in compromise of a nerve root or the spinal cord with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). The listings note that an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss" as well as concrete evidence of atrophy in upper and lower extremities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(E)(1).

Whether an impairment meets a listing is a question reserved to the ALJ, and, thus, Dr. Mills's opinion would not be entitled to special significance even if that opinion was as described by Ms. Molnar. *See* 20 C.F.R. § 404.1527(e)(2), (e)(3); *Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Regardless, Ms. Molnar misrepresents the record by insisting that Dr. Mills opined that she met Listing 1.04(A). Dr. Mills thought so initially but retreated when questioned by the ALJ about the lack of evidence of motor loss, a key element of the listing. The purpose of the evidentiary hearing was to explore and test the medical records and opinions of the expert witnesses, *see* 20 C.F.R. §§ 405.320(a); 405.350, and that purpose was served here. Dr. Mills started with an incomplete assessment of the relevant evidence and revised his opinion when the ALJ drew his attention to a weakness in his evaluation.

Ms. Molnar argues, however, that the ALJ was patently wrong in saying that Dr. Mills had "emphasized" that there was no evidence of motor loss. A.R. 12. She points to Dr. Mills's mention of two medical reports showing evidence of gait problems and numbness in her hands in 2005 and gait problems again in 2008. Although the ALJ's imprecise characterization perhaps overstates Dr. Mills's testimony, the ALJ's overall analysis on this point is nonetheless sound. Dr. Mills said he did not recall "any specific evidence of motor loss" and, recognizing that Ms. Molnar recently had experienced improvement, added that he did not know the current status of her symptoms. A.R. 261-62. Dr. Mills also confirmed that both mentions of gait problems and numbness in her hands had occurred before Ms. Molnar's surgeries. The listings expressly required the ALJ to consider the effects of Ms. Molnar's treatment, including surgery, on her ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(I).

We review the ALJ's opinion as a whole to give it the most sensible reading, *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), and later in her opinion the ALJ explained that the record shows Ms. Molnar made remarkable improvement after each surgery and epidural injection. This finding is supported by the

medical evidence in the record: following her second cervical fusion surgery in 2005, Ms. Molnar walked with a normal gait and had full motor strength in her upper and lower extremities; following her 2006 lumbar fusion surgery, Ms. Molnar reported no back pain, could walk with a normal gait, had full strength in her lower extremities and could move her neck freely; and after her third cervical surgery in 2007, she had full strength and sensation in her upper extremities. Thus, reading the opinion as a whole, we conclude that the ALJ developed an "accurate and logical bridge" from the evidence to her conclusion that the medical record lacked sufficient evidence of motor loss to meet Listing 1.04(A). *See Simila v. Astrue*, 573 F.3d 503, 516-17 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544-45 (7th Cir. 2008).

Second, Ms. Molnar challenges the ALJ's decision to discount her complaints of pain and resulting limitations as not entirely credible and instead credits Dr. Hinck's appraisal of her residual functional capacity. The ALJ was required to determine Ms. Molnar's residual functional capacity by evaluating whether the "objective medical evidence and other evidence" was consistent with her subjective complaints of pain and alleged limitations. *See* 20 C.F.R. § 404.1529(a), (d)(3)-(4); *Berger*, 516 F.3d at 544. We will reject an ALJ's credibility findings only if they are patently wrong. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). Nonetheless, an ALJ must justify her credibility finding with specific reasons supported by the record after considering the claimant's level of pain, medication, treatment, daily activities and limitations. 20 C.F.R. § 404.1529(c); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

Ms. Molnar contends that the ALJ discredited her complaints of pain based solely on the improvement she experienced after surgery and epidural injections and disregarded the possibility that her condition could worsen in the future. But the ALJ was permitted to consider the effectiveness of treatment, including surgery and epidural injections, in making her credibility determination. *See* 20 C.F.R. § 404.1529(c); *Terry*, 580 F.3d at 477. Ms. Molnar ignores the ALJ's other reasons for not fully accepting her testimony: there is no evidence that her medications were ineffective or caused any debilitating side effects; Ms. Molnar testified that she performs a wide range of daily activities without significant difficulty given her reported level of pain; and the record includes no evidence that her condition had significantly deteriorated since 2006, when she first reported the range of her daily activities. The ALJ further noted that Ms. Molnar's testimony that she needed to lie down frequently during the day was contradicted by the assessment of her own treating physician, to whom Dr. Mills deferred. The ALJ was permitted to consider whether Ms. Molnar's daily activities are inconsistent with her alleged inability to work. *See* SSR 96-8p; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ did not overstate Ms. Molnar's ability to perform daily activities but noted specifically that she was able to do, for example, only light household chores and light cooking. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Powers*, 207 F.3d at 435. Although the ALJ's conclusion that there was no medical evidence that Ms. Molnar's condition had

significantly deteriorated since early 2006 may overlook Ms. Molnar's third cervical surgery in 2008, Ms. Molnar's physical limitations appear to have improved since early 2006 as a result of her lumbar surgery and, to a degree, her latest cervical surgery. Moreover, the ALJ was required to determine whether Ms. Molnar was under a current disability, *see* 20 C.F.R. § 416.905(a), and Ms. Molnar points to no medical evidence to support her contention that she "will likely require additional surgeries in the future." Accordingly, the ALJ's credibility determination was not patently wrong.

Finally, as a result of the adverse credibility finding, the ALJ fully credited Dr. Hinck's assessment of Ms. Molnar's residual functional capacity. Ms. Molnar complains that the ALJ should have credited Dr. Mills's initial opinion that she is disabled and should have disregarded the opinion of Dr. Hinck. But Dr. Hinck was her treating physician, and his assessment of her work-related limitations was entitled to controlling weight if supported by objective medical evidence and consistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Moss*, 555 F.3d at 560. Ms. Molnar does not identify any contradictory medical evidence or any other record evidence that undermines Dr. Hinck's opinion. Nor does she identify any specific errors in the description of her residual functional capacity that the ALJ used in her questioning of the vocational expert. The ALJ appropriately questioned the vocational expert as to possible jobs that remained open to Ms. Molnar, and after clarification of the relevant work limitations, the vocational expert confirmed that four jobs exist in significant numbers in the regional economy that a person with Ms. Molnar's limitations can perform. Ms. Molnar has thus failed to show that the ALJ's residual functional capacity determination is unreasonable.

Accordingly, we AFFIRM the judgment of the district court.

AFFIRMED